**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| CARING PEOPLE HOLDCO, LLC, CARING PEOPLE MANAGEMENT SERVICES COMPANY, LLC, CARING PEOPLE FL OPERATING, LLC, CARING PEOPLE NJ OPERATING, LLC and CARING PEOPLE NY OPERATING, LLC, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2024-0125-SEM |
| SHALOM (STEVEN) EAST and JENNIFER DEVINE, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| SHALOM (STEVEN) EAST and CARINGONDEMAND, LLC, | ) ) ) | |
| Counterclaim and Third-Party Plaintiffs, | ) ) ) ) | |
| v. | ) ) ) | |
| CARING PEOPLE HOLDCO, LLC, CARING PEOPLE MANAGEMENT SERVICES COMPANY, LLC, CARING PEOPLE FL OPERATING, LLC, CARING PEOPLE NJ OPERATING, LLC, and CARING PEOPLE NY OPERATING, LLC, | ) ) ) ) ) ) ) ) | |
| Counterclaim Defendants, and | ) ) | |
| SILVER OAK CP, LLC, GREGORY M. BARR, and ANDREW GUSTAFSON, | ) ) ) | |
| Third-Party Defendants. | ) | |

# MEMORANDUM OPINION[1]

Date Submitted: February 20, 2026
Date Decided: March 10, 2026

Joseph B. Cicero, Ryan M. Lindsey, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Mark W. Freel, TROUTMAN PEPPER LOCKE LLP, Providence, Rhode Island; Alexandra G. Lancey, TROUTMAN PEPPER LOCKE LLP, Dallas, Texas; *Counsel for Plaintiffs*

Eric A. Veres, Michael T. Manuel, Benuel W. Stoltzfus, ABRAMS & BAYLIS LLP, Wilmington, Delaware; *Counsel for Defendant and Counterclaim and Third-Party Plaintiff Shalom (Steven) East and Counterclaim Plaintiff CaringOnDemand, LLC*

Periann Doko, BERGER MCDERMOTT LLP, Wilmington, Delaware; *Counsel for Defendant Jennifer Devine*

**MOLINA, Senior Magistrate**

---

[1] The parties agreed to submit this action to me for a final decision under 10 *Del. C.* § 350 and Court of Chancery Rule 144(g). Thus, I am issuing my ruling as a memorandum opinion which shall have the same effect as a decision of the Chancellor or Vice Chancellors and is subject to the same procedural and substantive review of that of the Chancellor or Vice Chancellors.

This case arises from a founder-investor relationship gone wrong. Despite thorough due diligence and early synergies, the parties found themselves in an imperfect match. With all agreeing that something needed to give, the founder agreed to stand down and, ultimately, depart. But he was not ready to retire.

While on his way out the door, the founder built a new team and ramped that team up to compete with his prior business. Although one can appreciate his entrepreneurial spirit, the founder breached his contractual obligations and is, herein, held accountable. He also aided his teammates in breaching their obligations, one of which was his co-defendant in this action and is held separately liable for breaching her contractual obligations.

Not one to back down from a fight, the founder pressed several counterclaims in this action. Those counterclaims largely fail, except under one provision in an LLC agreement, which required distributions for tax liabilities.

Ruling largely in the plaintiffs' favor, I award $4.304 million in damages, allocated ¾ to the founder and ¼ to his co-defendant teammate (plus pre- and post-judgment interest) and partial fee shifting. I also reinstate the original two-year terms of both the defendant's restrictive covenants to give the plaintiffs the benefit of their bargain. For the founder's counterclaim, I award him offsetting damages.

This is my post-trial ruling. It is being issued as a memorandum opinion, rather a final report, because the parties agreed to present this case to me for a final

decision, subject to the same procedural and substantive review of that of the Chancellor or Vice Chancellors.

## I. BACKGROUND[2]

This case began as a dispute between Caring People Holdco, LLC, Caring People Management Services Company, LLC, Caring People FL Operating, LLC, Caring People NJ Operating, LLC, and Caring People NY Operating, LLC, (the "Plaintiffs") and Shalom (Steven) East, CaringOnDemand, LLC, ("COD") and Jennifer Devine (with East, the "Defendants"). I dismissed the claim against COD, but it remains as a counterclaim plaintiff who, together with East, sued the Plaintiffs and third-party defendants Silver Oak CP, LLC ("Silver Oak"), Gregory M. Barr, and Andrew Gustafson, as further addressed herein. The following reflects my post-trial findings of fact.

### A. The Founding

East is an entrepreneur at heart. His friends and colleagues consider him a "very smart guy," who consistently helps his friends without expecting anything in

---

[2] The facts in this report reflect my findings based on the record developed at trial from January 20, 2026 through January 23, 2026, as well as those agreed upon by the parties in the joint pretrial stipulation. *See* Docket Item ("D.I.") 238–241 (trial transcript), 227 ("Pretrial Order"). Citations to the trial transcript are in the form "[Last name] Tr." referring to the testimony or objection of the identified person. Defined parties reflect that designation. The parties' jointly submitted exhibits are cited as "JX __." The lodged depositions are cited as "[Last name] Dep." Like the transcript citations, defined parties are identified with that designation. I grant the evidence the weight and credibility I find it deserves.

return.[3] At issue in this dispute is his business known as Caring People, which he founded in 1998.[4] East started Caring People as a small employment agency for nannies and housekeepers in Flushing, Queens New York.[5] But the company soon grew into a home healthcare company, focusing on providing assistance with daily activity for individuals who wanted to live at home.[6] East's connection to Caring People wasn't just financial—it was personal. He named Caring People after his grandmother, and he describes it as a "legacy business that [he] spent [his] entire professional career building."[7]

Under East's direction, Caring People grew and shifted its business to providing licensed private duty nursing and healthcare services.[8] East explained that Caring People has "a bill rate that [they] charge the customers based upon the amount of care that they need, which runs the entire spectrum."[9] When customers then pay for its services, Caring People first pays the caregivers, what East considers

---

[3] Feder Tr. 1085:19–20; Johnson Tr. 1256:15–21.

[4] East Tr. 357:20–23.

[5] East Tr. 358:1–4.

[6] East Tr. 358: 5–15.

[7] East Tr. 358:21–359:4.

[8] Pretrial Order ¶ 48.

[9] East Tr. 359:7–10.

"direct labor costs."[10] "The spread between those two numbers is the profit margin."[11]

Despite East's clear vision and business model, Caring People faced challenges. It struggled to distinguish itself from other home care agencies in the marketplace.[12] And the industry overall faced caregiver shortages and an increasing cost of care.[13] But East had a plan.

To set Caring People apart in the market and allow for even greater growth, East developed a technology platform, originally under the name Avior Sciences ("Avior").[14] When he created Avior in 2015, East had "grandiose" plans; he envisioned a technology platform operating as the single marketplace connecting agencies, caregivers, and clients, streamlining the entire home healthcare process.[15] That platform was eventually transitioned into COD,[16] an application through which

---

[10] East Tr. 359:10–12.

[11] East Tr. 359:12–13.

[12] East Tr. 363:2–7.

[13] East Tr. 363:14–16 (describing the home healthcare industry as "very fragmented" and the caregiver to client ratio as "about four to one").

[14] East Tr. 363:8–10.

[15] East Tr. 363:17–24.

[16] Barr Tr. 15:16–19; East Tr. 571:17–19.

clients in need of home healthcare "could hit the button, and request care."[17] That care, in the early years, then came exclusively from Caring People caregivers.

As time went on, Caring People grew and expanded. It owed much of its success to Devine, who joined Caring People in 2007 as the Director of Business Development in the Long Island region.[18] She testified that her role was to "educate people about what Caring People does and to bring on business."[19] She excelled and was promoted to Regional Director of Business Development.[20] Devine quickly became known as the top sales representative of the company.[21] And she received accolades and acknowledgement for her work at Caring People.[22]

---

[17] East Tr. 386:2–4; *see also* JX2008, at 22 (describing Avior as "an incubator for post-acute care technology that focuses on utilizing data analytics to improve patient quality of life and ease the burden of delivering healthcare services." The "web and mobile feature will enable [agencies] to engage with clients prior to being discharged from a facility, thereby allowing for earlier onboarding and shorter time-to-service.").

[18] Devine Tr. 911:12–17.

[19] Devine. Tr. 912:5–7. Devine conducted educational presentations at hospitals, assisted living centers, libraries, and senior centers while promoting the Caring People business. Devine Tr. 912:9–10, 18–22.

[20] Devine Tr. 911:12–17.

[21] *See* Barr Tr. 35:24–36:2; East Tr. 639:3–5; Kornblum Tr. 643:12–17 (noting that Devine was pointed out as the highest-performing sales rep and a "critical force" in New York, and that "the loss of Jen Devine would be catastrophic to the business").

[22] Devine Tr. 921:6–13, 923:3–7. It was even estimated that she brought in over $25 million in annual sales. JX122 at 2.

## B. 2016 Growth & Agreements

By 2016, Caring People had grown far from its humble beginnings. No longer just a Queens operation, by 2016, Caring People was providing home healthcare in New York, New Jersey, and Florida.[23] With East's leadership and Devine's business development, Caring People generated over $30 million in gross revenue and $4 million in annual profit.[24] This success came despite stiff competition, with roughly 400,000 direct providers of home care services in the United States and "thousands" in New York and New Jersey.[25]

With its growth and success, Caring People took steps to formalize and protect its business. For example, it developed a corporate compliance plan and required top employees to acknowledge and sign onto it. Devine did so on August 29, 2016.[26] On that same day, Devine signed a Business Protection Agreement (the "BPA").[27] The BPA was between Devine and Homestar LLC, on Caring People letterhead, and barred Devine from misusing the company's confidential information or competing with, or soliciting any employees of, the company for the term of her employment

---

[23] East Tr. 364:7–10.

[24] JX5 at 3–4.

[25] East Tr. 36024–361:10.

[26] JX1 at 7–13.

[27] JX1; Devine Tr. 968:8–13.

6

plus six months.[28] With the compliance plan and the BPA, Devine also signed a non-solicitation agreement wherein she agreed not to solicit or accept employment directly by any client of Caring People during her employment with Caring People and for a period of six months thereafter.[29]

## C.    The Silver Oak Acquisition

As Caring People continued to grow, East began looking for outside investors.[30] He first looked to Lineage Capital, a Boston-based private equity firm who he thought understood the home healthcare space.[31] But after extensive due diligence, Caring People and Lineage were unable to agree on one key factor—the fate of COD; Lineage wanted COD to be part of the transaction,[32] but selling COD was a step too far for East.[33] With COD off the table, any deal was dead on arrival.

---

[28] JX1 at 17.

[29] JX1 at 6.

[30] East Tr. 364:11–16.

[31] East Tr. 365:12–14.

[32] East Tr. 365:14–21.

[33] East Tr. 365:14–21 (explaining, "[w]e worked through a bunch of diligence and got to the point of an LOI. Here was one caveat for me that we got stuck on, is they wanted [COD]. They were offering some consideration for it. But for me, it was a little too new, and I wasn't prepared to kind of sell it. So that was a big sticking point, and that ultimately led to us not being able to go forward.").

Then another opportunity arose. East received an email from a buy-side broker, introducing him to Gregory Barr and Silver Oak.[34] Silver Oak is a Delaware limited liability company and an affiliate of Silver Oak Services Partners, LP, a private equity firm headquartered in Evanston, Illinois.[35] Barr founded Silver Oak in 2005, where he now serves as the managing partner.[36] Also instrumental in the Caring People-Silver Oak transaction was Andrew Gustafson, who has been a partner at Silver Oak for the last thirteen years.[37]

Silver Oak is an experienced private equity firm. Over its twenty-one years of operation, Silver Oak has purchased a controlling interest in 40 platform companies and over 100 add-on acquisitions.[38] This experience poised it to conduct thorough due diligence into the Caring People opportunity.

Through that due diligence and negotiations, Barr understood the nature of Caring People's business to be private-duty home care in the northeast United

---

[34] *See* East Tr. 364:18–365:2; *see also* JX 2003; Barr Tr. 8:22–9:3 (testifying that he was first introduced to East "through a buy-side broker called Chestnut Hill Partners").

[35] Barr Tr. 6:21–22; Pretrial Order ¶ 52.

[36] Barr Tr. 6:18–7:1.

[37] Gustafson Tr. 734:16–21.

[38] Barr Tr. 7:5–8. Barr explained that Silver Oak's process for evaluating investments is complex. The team researches and identifies sectors of interest. *Id.* at 7:13–19. Once a business is identified, due diligence begins. The accounting firms do quality checks on earnings, consultants perform market studies and customer surveys, and the investment team reviews multiple performance metrics. *Id.* at 7:22–8:3. Typically, once a company is acquired, the Silver Oak investment team sits on the board of the company along with the acquired CEO. *Id.* at 8:7–15.

States.[39] Like with Lineage, East disclosed and Silver Oak looked into Avior/COD.[40] East was upfront about his "vision to build applications and tools that will support and enhance [Caring People] services" through what he called his "software development entity whose focus would be addressing through technology the New Post Acute Care landscape."[41] Having learned from the failed Lineage deal, East pushed Caring People and COD as a packaged deal, hoping Silver Oak would acquire both and envisioning the two platforms working in tandem. But Silver Oak was less interested in the package and negotiations were difficult, with lots of back and forth, which "kind of colored [the] relationship going forward."[42]

Ultimately, Silver Oak passed on the COD opportunity. From Barr's perspective, there had been no indication that Avior/COD was involved in any way, directly or indirectly, in providing home care services.[43] Silver Oak left negotiations convinced that COD was sufficiently separate but Barr did have concerns about East serving as CEO of both Avior/COD and Caring People, worrying that East's

---

[39] Barr Tr. 9:6–9.

[40] Barr Tr. 9:17–23.

[41] Barr Tr. 10:17–11:3; JX2 at 2.

[42] Gustafson Tr. 736:20–24.

[43] Barr Tr. 11:4–7. Barr testified that if there had been such an indication, Silver Oak would not have purchased only one of the two intertwined businesses that offer the same services, because that would not have made sense. Barr Tr. 11:8–13.

attention would be divided.[44] Nevertheless, Silver Oak did extensive due diligence and decided to move forward with a deal solely regarding Caring People.[45]

Through the Purchase and Contribution Agreement dated March 20, 2017 (the "PCA"), East agreed to sell a controlling interest in Caring People to newly created entities formed by Silver Oak.[46] Altogether, the purchase price was $30,250,000.[47] At closing, East received $11.3 million in cash.[48] He also retained roll over equity of about 40% ownership of the new entity formed for the Caring People, which was valued at about $8.4 million.[49]

---

[44] Barr Tr. 11:14–24. To combat these concerns and keep the negotiations going, East assured Silver Oak that he had a software leader in place to do the day-to-day work at Avior/COD, thereby leaving East only general oversight duties. East confirmed that his full time and attention would be on Caring People moving forward. Barr Tr. 12:1–8

[45] East Tr. 366:7–11.

[46] Pretrial Order ¶ 54; JX8. COD was explicitly excluded from the sale. *See* JX8 at 21; JX13 at 317.

[47] JX 8 at 24; Barr Tr. 13:2–8. Barr explained that per industry custom, the purchase price was reached through a valuation of Caring People on multiple earnings such as earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and finally applying a purchase multiple of 7.8 to that earning stream. Barr Tr. 20:2–10.

[48] JX7 at 1; Barr Tr. 16:4–10.

[49] JX7 at 1; Barr Tr. 16:12–17. There were several holdbacks at closing. The indemnity escrow, totaling $1.5 million, was a holdback for potential breaches of representations and warranties post-closing. JX7 at 1; Barr Tr. 17:4–8. Those funds were eventually released to East. Barr Tr. 17:7–8; East Tr. 467: 15–22. The purchase price holdback, $2.65 million, was held pending the transfer of the healthcare license to the new entity. JX7 at 1; Barr Tr. 17:13–18. The license was transferred, and the funds disbursed to East. Barr Tr. 17:18–21; East Tr. 468:2–10. The earnout holdback, $2.25 million, was conditioned on completion of a performance hurdle based off the first year of EBITDA that Caring People generated. JX7 at 1; Barr Tr. 18:1–5. The company ultimately failed to meet that goal, but East was still paid at least half of that amount after negotiations. East Tr. 468:11–469:4 (testifying that he received "probably half, maybe a little but more than half" of the funds); Barr Tr.

10

Through the PCA, East agreed to several restrictive covenants binding his conduct during this continued employment with Caring People and for a period of two years thereafter.[50] Those restrictions include a noncompete, a non-solicit, and a confidentiality clause.[51] But East carefully negotiated carve-out for Avior/COD,.[52] It provides, in part, "nothing in this Section 9.1 [(the non-compete)] shall be deemed to prohibit or restrict the business activities of [Avior/COD] so long as [Avior/COD] is not engaged in a Restricted Business. For avoidance of doubt, the Parties agree that [Avior/COD's] business as of the First Closing is not a Restricted Business."[53]

In addition to the PCA, at closing, East signed onto the new entity's LLC agreement (the "Holdco Agreement") and an Incentive Unit Agreement (the "East IUA"). In the Holdco Agreement, East agreed that certain "trade secrets and information of a proprietary or confidential nature relation . . . to the business and customers of the Company" would be disclosed to East, and that his "relationship to

---

18:16–19. The unpaid amount ultimately went back into Caring People. Barr Tr. 18:20–24. The final holdback was for employment withholdings, for $2.28 million. JX7 at 1. Through Silver Oak's diligence, it discovered that East had failed to pay taxes on some of the employee withholdings due to classification issues. Silver Oak escrowed the money to satisfy East's obligations to the government. Barr Tr. 19:3–10; East Tr. 469:10–15.

[50] JX8 at 75.

[51] *Id.* at 75–77.

[52] Barr Tr. 14:19–15:9.

[53] JX8 at 76. Gustafson explained that had Avior/COD been operating as a direct provider of home healthcare services, Silver Oak would not have agreed to the carve out, and likely would not have gone through with the deal. Gustafson Tr. 736:12–15.

the other Members and to the Company with respect to such Confidential information shall be fiduciary in nature."[54] Through the East IUA, East agreed to additional restrictive covenants for the duration of and until two years after his ownership of incentive units granted therein.[55] The East IUA prohibited East from hiring, soliciting, or attempting to hire any Caring People employees, and from soliciting any actual or prospective customer or referral source of Caring People.[56] As consideration for these covenants, East received 200,000 Class B Units, 200,000 Class C-1 Units, 200,000 Class C-2 Units, and 200,000 Class C-3 Units.[57]

As an identified top employee, Devine was also granted incentive units and was invited to sign an Incentive Unit Agreement (the "Devine IUA"). Devine signed the Devine IUA on the same day as East executed the East IUA (March 20, 2017). The Devine IUA contained the same restrictions in the East IUA and, as consideration, Devine was granted 40,000 Class B Units, 40,000 Class C-1 Units, 40,000 Class C-2 Units, and 40,000 Class C-3 Units.[58]

---

[54] JX9 at 55–56.

[55] JX10 at 6.

[56] Id.

[57] Id. at 1.

[58] JX12.

## D. Initial Success

With the acquisition complete, Silver Oak and East worked together to grow Caring People's business. Silver Oak's strategic plan was optimistic. It involved building Caring People into a leading national provider of private duty home care services, envisioning over $100 million in revenue with 15–20% EBITDA margins.[59] To reach such a lofty goal, they planned to "[a]gressively grow through multiple add-on acquisitions per year" focusing on private duty, private pay home care services in adjacent markets.[60] Finally, they planned to invest in corporate infrastructure to allow acquisition growth without negative impacts to the business.[61] These goals were in line with East's vision for Caring People; he also wanted to aggressively expand through acquisition.[62]

To that end, Silver Oak and East would work in tandem. East would continue as CEO,[63] Barr and Gustafson would serve on the board, and Silver Oak, through a management services agreement, would provide several services to Caring People, such as general executive and management services, business development

---

[59] JX2011 at 4; Barr Tr. 368:5–11.

[60] JX2011 at 4.

[61] JX2011.

[62] East Tr. 369:1–10.

[63] Barr Tr. 23:6–11; East Tr. 382:23–383:3.

13

functions, negotiation and analysis of financing alternatives, finance functions, marketing functions, and human resource functions.[64]

This team resembled Silver Oak's typical framework, meant to empower the founder with Silver Oak's capital and advice. The way Silver Oak saw it, East was in "charge. He's the CEO. It's his team. [Silver Oak's] job is to help with strategic decisions, help to build the business, help him do things he's never done before[.]"[65] But the relationship between Silver Oak and East was not perfect.

In particular, East and Gustafson never saw eye-to-eye; Gustafson explained that the relationship had "never been great" especially at the time of the deal and immediately post-deal.[66] He found it difficult to build trust with East due to "walls being put up and lack of as much transparency and communication[.]"[67] The lack of transparency made it difficult for Silver Oak to truly understand how best to help Caring People.[68]

---

[64] JX11 at 1–2.

[65] Gustafson Tr. 741:3–7. Gustafson explained that if East was just a "passenger on the train, something has gone wrong." Gustafson Tr. 740:19–741:1.

[66] Gustafson Tr. 737:12–17.

[67] Gustafson Tr. 739:5–8.

[68] Gustafson Tr. 739:8–11. Gustafson described these issues as understandable, if not expected. "Most of the deals we do are investing alongside founders who are most often the CEO. And to transition from being a founder who owns your own business without having any oversight or boss or board to then having people who are a board above you and have a majority interest in the company is a difficult transition, and it's difficult for most people." Gustafson Tr. 737:18–24.

Nevertheless, Caring People was doing well even during the COVID-19 pandemic; while countless businesses struggled, Caring People excelled under East's leadership. Caring People's main clients—senior citizens—were those most impacted and exposed to COVID, and many did not want caregivers to come into their homes.[69] But East pivoted Caring People into senior living facilities struggling with staffing issues. Caring People—with the help of COD—entered staffing agreements with those facilities, where Caring People's network of providers would use COD to sign up for vacant shifts at facilities.[70] The change to staffing agreements led Caring People to have "some of [its] best months" under East's tenure as CEO.[71]

### E.     The Tax Credits

During the pandemic, Caring People applied for employee retention tax credits ("ERTC") to help employees with tax obligations. The program was designed to help businesses navigate the downturn in revenue brought by the pandemic.[72] East agreed to apply to the program, and that application was ultimately granted.[73]

---

[69] East. Tr. 389:21–390:8 (describing the home care industry being "decimated" by COVID, and seeing an "almost complete shutdown" of all home care visits).

[70] Barr Tr. 89:22–90:2 ("East had done a good job of finding ways to generate revenue in COVID, and one of them was staffing agreements with assisted living centers[.]"); East Tr. 390:16–391:6 ("So [COD developers] built for them . . . a front end for their facilities to put in all care requests. And where it was appropriate for Caring People, we made sure that Caring People was the ones facilitating those requests.").

[71] East Tr. 390:12–14, 391:6–7.

[72] Barr Tr. 52:13–15.

[73] Barr Tr. 52:16–22; East Tr. 620:16–21.

The ERTC program granted Caring People a series of payments to eventually distribute to shareholders, but it was not clear when, if at all, those payments would be approved by the relevant authorities.[74] The company expected eighteen checks in all, totaling roughly $13–14 million.[75] Amerisa Kornblum, Caring People's Chief Financial Officer, explained that the company planned to make tax distributions to shareholders, use the funds for operations, and to pay down debt.[76] But not all eighteen checks were ultimately received. Three checks bound for New York were lost or stolen and misappropriated. To date, two checks are still missing, and as a result, all unit holders of Caring People incurred tax liabilities, including East and Silver Oak.[77]

To help East with his significant tax liabilities and the missing or delayed ERTC credits, Gustafson and Silver Oak offered him a loan.[78] East was appreciative

---

[74] Barr Tr. 53:1–9.

[75] Kornblum Tr. 663:19–664:3 (explaining that the company could only apply for three fiscal quarters of the 2021 tax year, times six states Caring People operated in, equaling eighteen checks in total).

[76] Kornblum Tr. 664:4–16 (noting Caring People had over $20 million in debt at this time).

[77] Barr Tr. 53:21–54:1 (explaining that Silver Oak would not pay distributions in advance of receiving the tax credits). Kornblum explained that even when Caring People received cash from ERTC's, Silver Oak was more inclined to pay down debt first because it was in the best interest of the shareholders. Kornblum Tr. 725:19–24.

[78] Gustafson Tr. 769:13–16.

of the offer, and Silver Oak had counsel draft the note. But after several rounds of discussions and the final form of note was prepared, East stopped responding.[79]

### F.    Acquisition Opportunities

After Silver Oak's investment, Caring People continued to grow through acquisitions. East, as CEO, brought several acquisition opportunities to Caring People. One was with Eric Johnson, who reached out to East when he was considering selling his home care company based in Connecticut.[80] Caring People acquired Johnson's company, and he became an equity holder in Caring People.[81]

But not all acquisition targets proved to be successful. East had an opportunity with Hackensack, what he described as "the second largest hospital system in New Jersey."[82] Per East, the opportunity to create a joint venture with Hackensack would have been "transformational" for Caring People.[83] East set up a meeting with Hackensack's legal and operations team, the executive team, and Gustafson.[84] From East's view, though, Gustafson had his mind made up before the meeting even began

---

[79] Gustafson Tr. 769:19–770:4.

[80] East Tr. 380:3–7.

[81] Johnson Tr. 1244:2–5. Johnson stayed on with Caring People for about a year and a half, working on source deals. Johnson Tr. 1243:4–10. Johnson also invested a further $300,000 into the company. Johnson Tr. 1243:22–1244:1.

[82] East Tr. 392:6–8.

[83] East Tr. 393:10–13 ("a private pay healthcare company with a joint venture to the hospital system, you could leverage that into a whole new level.").

[84] East Tr. 393:14–20.

and spent the meeting listing out "all the reasons why this could be challenging for Silver Oak to exit their investment in Caring People by creating this joint venture structure."[85] Gustafson's pragmatic approach pushed Hackensack away, and Hackensack informed East that they would not go forward with the acquisition just thirty minutes after the meeting ended.[86]

Sometime later, Five Star, a chain of assisted living communities, reached out to East with a proposal to acquire Caring People.[87] East ran point on the opportunity, and worked on a deal that would have included both Caring People and COD.[88] That joint deal fell through.[89] But East continued to negotiate a deal for COD only.[90] Silver Oak was not involved in those discussions, but East provided them proposed term sheets and markups detailing how the relationship would look if Five Start bought COD.[91] That relationship, according to Barr, would be complicated, making

---

[85] East Tr. 394:1–5.

[86] East Tr. 394:6–10.

[87] Barr Tr. 30:6–14.

[88] Barr Tr. 31:8–12 ("at that point it seemed that [East] was—he was working the Five Star opportunity for both CaringOnDemand and Caring People.").

[89] Barr Tr. 98:16–18;

[90] Barr Tr. 98:19–23.

[91] JX2098.

Silver Oak essentially a third-party nonbeneficiary.[92] Nevertheless, the COD-only Five Star deal fell through as well.[93]

The last acquisition opportunity of note was Project Appleseed. East received an email—to his Caring People email address—regarding the project, a leading homecare provider in the Midwest United States.[94] To consider the acquisition, East executed a nondisclosure agreement provided by Project Appleseed and received materials therefrom.[95] Despite pursuing the opportunity for Caring People, East then forwarded the materials to Bryan Flynn, the COO of COD and Silver Oak.[96] Caring People—at the direction of Silver Oak and Gustafson—decided not to go through with the deal due to the "geography and the carve-out dynamics."[97]

---

[92] Barr Tr. 99:10–16.

[93] Barr Tr. 105:5–17 (explaining Silver Oak was "very happy [the deal] died").

[94] JX43 at 2.

[95] East Tr. 609:14–17. East did not agree that he signed the NDA, despite responding "[p]lease see the attached NDA, looking forward to learning more about this opportunity." *Compare* JX43 at 1 *with* East Tr. 609:19–610:13. His testimony was not credible in light of the record.

[96] JX43 at 1; JX1032; East Tr. 610:22–611:10. East explained that he would "float things by [Flynn] often" because he worked on mergers and acquisitions, despite admitting that such acquisitions were Silver Oak's responsibility under the Management Agreement. East Tr. 611:8–17.

[97] JX1033.

## G.    COD Grows

While Caring People grew, so did COD. That growth, to some extent, was foreseeable. Silver Oak knew that East planned for COD to offer its technology services not just to Caring People but to other healthcare agencies.[98] Immediately following the transaction, Caring People used COD to distinguish itself from the competition, all while COD was improving its technology.[99] For the first two years under Silver Oak, East considered that the two companies so integrated that there was "little distinction" between Caring People and COD.[100]

Because the companies became so intertwined, they felt the need to update the original master services agreement between Caring People and COD. The original agreement—signed when the Silver Oak transaction closed—did not speak to what COD was or the relationship between COD and Caring People.[101] As such, the parties entered a new agreement on September 1, 2019 (the "2019 COD Agreement").[102]

---

[98] Gustafson Dep. 45:20–46:14 ("[East] was pitching it as a way to—to, you know, really help Caring People, but in doing so, he also wanted to sell those software products to other home care agencies as a software provider and benefit from the investment he was making in the code in the software.").

[99] East Tr. 383:9–14.

[100] East Tr. 383:9–20.

[101] East Tr. 384:12–17.

[102] JX2029; JX19 (outlining the pricing structure of the 2019 Agreement for COD's time and attendance application).

The 2019 COD Agreement defined "On Demand Visit[s]" as any visit that originates through the COD application.[103] East believes that around the September 2019 timeframe, Caring People had roughly 15,000 visits a month that qualified as "On Demand,"[104] and that from 2019 through March 2023, COD failed to bill roughly $1.8 million in revenue.[105]

The distinction between Caring People and COD was not apparent in the marketplace, with clients seeking services or care from COD. But the lines, per East, were clear: facilities and residents were connecting with COD as a brand and solution while keeping Caring People as the service provider.[106] According to East, all COD was doing was providing clients with access to care services via their technology platform.[107]

Shortly after the 2019 COD Agreement was signed, the parties amended the Silver Oak management services agreement.[108] The amendment added "New Silver

---

[103] JX2029 at 2; East Tr. 385:6–15.

[104] East Tr. 386:7–18.

[105] East Tr. 388:5–9. East explained that this discrepancy was due to logistical challenges, most notably that Caring People wanted to own all financial data. Because Caring People owned the data, COD wasn't able to fully view or calculate the amounts owed. East Tr. 387:19–388:4.

[106] East Tr. 399:17–21.

[107] East Tr. 398:12–14.

[108] JX2114.

Oak" as a party, assuming all benefits and obligations of the original Silver Oak, while retaining the prior substance.[109]

With the memorialized 2019 COD Agreement and amended management agreement, Caring People and COD did well. Quarterly reports for 2019 through 2020 show a steady increase in revenue over the previous years.[110]

## H.    Fractures Deepen

Increased revenue was not enough to quell the growing tension between East and Silver Oak. On the Silver Oak side, Barr and Gustafson grew dissatisfied with East's leadership as CEO. At bottom, Barr did not consider East to be a good CEO.[111] Sure, he was good at business development, but in Barr's view, East struggled with "keeping the trains running on time . . . holding people accountable, sales force development, training, [and] retention."[112] In contrast, East felt stifled by Silver Oak's management. He often complained that Silver Oak did not understand the business, making them bad partners.[113] At one point, East even asked Barr and Silver Oak to keep Gustafson out of an acquisition process, a request that Barr viewed as

---

[109] JX2114; Barr Tr. 71:14–72:7.

[110] *See* JX254 at 18–25.

[111] Barr Tr. 23:20–21.

[112] Barr Tr. 23:23–24:6.

[113] Kornblum Tr. 646:1–4.

disappointing.[114] East, on the other hand, believed that the seller would not respond well to Gustafson's personality.[115]

The conflict between the two management styles reached a boiling point in 2022. Barr, Gustafson, and the board of Caring People became increasingly disenchanted with East's leadership.[116] East noted that the parties were having constant arguments, comparing the relationship to a "bad marriage."[117] The rocky relationship culminated in a forty-five minute, "no holds barred" Teams call where, according to East, he was berated and called incompetent by Silver Oak.[118] The next day, recognizing that neither party was happy with the relationship, East offered to resign.[119] Accepting that offer, Silver Oak engaged a search firm to identify new CEO targets.[120]

East agreed to stand down in the search and onboarding, recognizing that for a new CEO to thrive, they would need an "unobstructed opportunity to mold the company in [their] vision."[121] East was concerned that his continued presence and

---

[114] JX2028 at 1.

[115] JX2028 at 1.

[116] Barr Tr. 26:2–4.

[117] East Tr. 406:15–16.

[118] East Tr. 406:20–24.

[119] East Tr. 407:1–8.

[120] Barr Tr. 26:4–6.

[121] JX2040.

participation in Caring People might not allow for that opportunity.[122] But when the search led to Anthony Spero, East went against his own advice and voiced his concerns.[123] Silver Oak, nonetheless, hired Spero in May of 2022.[124] As planned, East stepped down as CEO and into a one-year role as chairman of the board, with a $500,000.00 salary[125]

The transition was anything but smooth. Silver Oak and Spero contend that after the transition, East was bad-mouthing Spero behind his back to the team, warning how bad things were going to get at the Company.[126] Rumors aside, Spero found East unhelpful during the transition, especially when East chose to go on vacation instead of introducing Spero to Caring People's markets.[127] But, with or without East's assistance, Spero took and continues to hold the Caring People helm.

## I.    COD Termination

After East stepped down and Spero took over, COD decided to renegotiate the 2019 COD Agreement in the beginning of 2023. As noted, East asserted that COD was being underpaid to the tune of $1.8 million.[128] Caring People found that

---

[122] *Id.*

[123] East Tr. 410:4–11.

[124] Spero Tr. 173:18.

[125] Barr Tr. 26:9–14; JX32.

[126] Gustafson Tr. 743:2–7.

[127] Spero Tr. 177:19–178:1.

[128] East Tr. 388:5–9.

assertion shocking, because the company was confident it paid every invoice presented by COD and reconciled those visits against each invoice received.[129] East nevertheless proposed modifying the 2019 COD Agreement to give COD more favorable terms, which he argued would also bring Caring People up to par with the other providers in the COD network.[130] The proposed modifications, however, were untenable for Caring People.[131]

Ultimately, by email dated March 8, 2023, Bryan Flynn from COD terminated the Caring People/COD relationship.[132] Spero acknowledged the termination, as well as COD's offer to continue to support its software through April 30, 2023.[133] COD later sent an invoice for post-termination work but, because they never provided a statement of work, Caring People refused to pay.[134]

With the 2019 COD Agreement terminated, East began looking for other providers to add to the COD network to replace Caring People. That opportunity

---

[129] Kornblum Tr. 653:2–6.

[130] East Tr. 421:10–18.

[131] *See, e.g.*, Kornblum 654:10–14 (discussing that COD wanted to increase the price of its electronic visit verification from 30 cents per visit to 75 cents per visit, something that was "extraordinarily out of the realm of possibility" for Caring People); Kornblum Tr. 655:1–12 (explaining that a proposal that allowed COD to control the cash while Caring People paid caregivers directly made her "very uncomfortable").

[132] JX70.

[133] JX79.

[134] Kornblum Tr. 660:5–16; *see also* JX117; JX18.

came through Beacon Eldercare ("Beacon"), a licensed home healthcare agency in New York.[135] In March of 2023, Jen Devine reached out to John Jongebloed, the husband of Beacon's owner, to request materials related to Beacon's clients.[136] When the materials were received, Devine forwarded them to East at his COD email address.[137] East was intrigued by the Beacon opportunity. He sent Devine a list of follow up questions for Jongebloed and Beacon's owner, Yvonne Murphy.[138] When Devine and East received the answers, they set up a meeting with Beacon at Caring People's office in Jericho, NY on March 14, 2023.[139] Devine did not attend.[140] In fact, the only Caring People representative there was East.[141]

These early discussions with Beacon occurred when both Devine and East were still employed with Caring People. Neither Silver Oak nor the board of Caring People had any idea that Devine and East were meeting with a competitor.[142] East

---

[135] Barr Tr. 35:1–6. Barr considered Beacon a "direct competitor of Caring People." *Id.*

[136] JX72; Barr Tr. 36:10–12. Devine reached out through her Caring People email address.

[137] JX72.

[138] JX73.

[139] *Id.*

[140] East Tr. 480:22–24.

[141] East Tr. 481:2–8.

[142] Barr Tr. 37:19–21.

26

believed that there was "no chance on this planet" that Silver Oak would have been interested in purchasing Beacon.[143] Regardless of his belief, East never asked.[144]

As a business, Beacon was not the most interesting acquisition opportunity for East.[145] What was interesting, however, was Beacon's license to practice home health care in New York State. Those licenses are "almost impossible" to get, and even the transfer of a license is a long and arduous process.[146] East saw the license as a potential asset for Devine in the future.[147]

To transfer the Beacon license, East or Devine needed to create an entity to receive it. In what he described as a "retirement plan for [Devine]," East helped Devine and Eric Johnson create Polaris, an LLC designed to receive the transferred license.[148] East reasoned that by putting Devine's name on the LLC agreement for Polaris, the company would "sit on the shelf for the next three to five years" while

---

[143] East Tr. 432:20–22.

[144] East Tr. 484:2–9.

[145] East Tr. 433:18–21.

[146] East Tr. 433:22–434:4.

[147] East Tr. 434:5–8. But East did not just focus on Beacon during this period. In February 2023, East asked to meet with Devine and Feder to "discuss what [they] have done in Senior Living and how we can use their knowledge to further the COD workflow and process." JX55. A month later, East asked Feder and Devine to "cold call" referral source facilities in Arizona on behalf of COD. JX86.

[148] East Tr. 434:22–435:23; Polaris was officially formed on April 4, 2023. Pretrial Order ¶ 69. *See also* JX85 (East texting Johnson about the Beacon opportunity).

waiting for the license to transfer. Then, in theory, Devine would have the Polaris license to sell or work with, years down the line.[149]

Despite this long-term plan, East took steps to make the Beacon license usable almost immediately upon formation of Polaris. While the deal was being finalized, East told Beacon that he discovered an end around to the lengthy transfer timeline. Specifically, if Polaris and Beacon entered into a consulting agreement, Polaris could use the license and operate the business while waiting on the official transfer.[150]

That agreement was memorialized on April 3, 2023, when Devine and Johnson executed a Polaris written consent agreement.[151] That agreement allowed Polaris to enter into a management agreement, consultative services agreement, and an agreement to purchase substantially all the assets and business of Beacon.[152]

Polaris continued to formalize the Beacon agreements with the direct help of East. At trial, East continuously tried to downplay his involvement, but the deal would not have happened without him. East prepared a letter of intent that was signed by Beacon on April 5, 2023.[153] Days before, East coordinated the creation of

---

[149] East Tr. 435:10–18.

[150] JX75.

[151] JX90.

[152] *Id.*

[153] JX101; East Tr. 486:14–16.

28

Polaris's articles of organization with counsel.[154] And, although East denied any involvement beyond facilitating the agreements, East paid counsel their fee for preparing and filing the documents.[155] With the deals signed, East created Polaris email addresses for himself, Devine, and Gail Feder, another Caring People employee.[156] And the same day that the letter of intent was signed, East tendered his resignation as chairman of Caring People. That resignation was accepted by letter dated April 7, 2023, where the Caring People board reminded East of his restrictive covenants and set a final date of employment for April 28, 2023.[157]

Before his effective end date at Caring People, East took further steps to aid the Beacon-Polaris merger. On April 18, 2023, East, Devine, and Feder discussed reaching out to the Residences, a care community working with COD and Caring People, in an effort to get Beacon caregivers involved there.[158] And then, on April 27, 2023, East texted Devine and Johnson, addressing them as "Executive team

---

[154] JX91. East communicated with counsel through his COD email address, copying Johnson and Devine. East denied, however, that counsel was writing to him as a client, and instead explained that the email was sent to him simply because he was part of the process. East Tr. 493:15–23.

[155] East Tr. 494:8–13. East explained that he sent the payment on behalf of Johnson.

[156] East Tr. 437:13–16.

[157] JX94. East resigned one month before his one-year term as chairman was set to end. East Tr. 502:16–23.

[158] JX104; East Tr. 557:5–560:6.

Polaris."[159] Therein, East wrote that he spoke to Beacon, and he felt "we should move forward" with the deal.[160] That same day, the Polaris team executed the Asset Purchase Agreement (the "APA") where Polaris formally acquired the assets of Beacon, including its New York home healthcare license.[161]

With the APA signed, East made a series of loans to help Polaris:[162] $50,000 on May 17, 2023,[163] $30,000 on June 7, 2023,[164] and $30,000 on June 28, 2023, all to help Polaris meet its payroll obligations and operating costs.[165]

## J.  The Departures

Within six months of the deal between Polaris and Beacon, East, Devine, and Feder left Caring People, all with different explanations. As noted, East left first, claiming that the relationship between he, Caring People, and Silver Oak ran its

---

[159] JX114.

[160] *Id.*

[161] JX108. Sometime after the APA, Ms. Murphy went missing and her whereabouts remain unknown.

[162] There is some confusion over to whom these loans were made, either Polaris as an entity or Johnson personally. For example, at trial, East said he gave the money to Johnson so that Polaris could complete its payroll obligations. East Tr. 438:21–439:7. But he represented elsewhere that he loaned the money to Polaris New York. JX247. East explained that the loans came from a charitable perspective, stemming from a principle his grandmother instilled in him that "caregivers can't work and not get paid." East Tr. 438:17–20.

[163] JX280; DDX01.

[164] *Id.*

[165] *Id.*

course.[166] His resignation was accepted on April 7, 2023, and his final day with Caring People was April 28, 2023—the day after the Beacon-Polaris deal was finalized.[167] East remained on the board of Caring People until February 12, 2024.[168]

Devine, still the highest earning salesperson for Caring People, followed suit shortly after. According to her, Devine felt that her work with Caring People was taking too much from her personal life, and specifically from her children.[169] She felt that she was not keeping up with work expectations, especially after considering the money she was being paid.[170] Devine, thus, tendered her resignation on May 1, 2023, with an end date of May 30.[171] That end date was eventually postponed, and Devine stayed through June 15 in an effort to assist with the transition.[172]

Her expectations and plans post resignation were unclear. She indicated that she was fine with leaving her job at Caring People—where she made $350,000 per year plus commission—to stay at home and care for her family without

---

[166] East Tr. 406:12–19.

[167] JX94.

[168] JX203. This lawsuit was filed the same day.

[169] Devine Tr. 936:4–8.

[170] Devine Tr. 985:21–986:2. Devine further explained that East's departure from Caring People played a role in her decision to leave. *Id.* at 983:14–17.

[171] JX115.

[172] Devine Tr. 93320–934:10.

compensation.[173] Caring People was under the impression that Devine would not be pursuing other employment opportunities post resignation.[174] But according to Devine, she never fully ruled out working. Despite Caring People's impression, Devine insists that she never said that she would be staying home completely, being very clear that she would be doing some independent work in the field.[175] And more, she contends she reached out to Caring People to inquire about the terms of her restrictive covenants, so she can "do[] the right thing" while building an independent referral business as a contractor.[176]

Even though the timing of East and Devine's departure seemed suspect, East claims he did not encourage her to leave Caring People. He considered her resignation to be "terrible" for the shareholders.[177] So much so that East, on his own accord, emailed the Caring People board on Devine's behalf.[178] Through that email, East raised his concerns about Devine's departure, noting the number of sales she was responsible for and encouraging the board to consider increasing her

---

[173] Devine Tr. 966:14–19.

[174] *See* Spero Tr. 206:8–12, 330:2–7.

[175] Devine Tr. 385:13–20.

[176] JX133.

[177] East Tr. 379:8–10, 447:12–24.

[178] Devine Tr. 985:2–6; JX121.

compensation.[179] When the email was sent, however, Silver Oak and Caring People had no knowledge that East had just assisted Devine in becoming the 50% owner of a newly created company that acquired a license of a competitor.[180] Thus, at East's behest, Caring People made multiple attempts to retain Devine between May 1 and June 15, 2023. Spero and the board "put multiple iterations of compensation packages in front of [Devine] in order to try and negotiate her retention."[181] Those attempts ultimately failed, because Devine was hesitant to enter further contracts with Caring People.[182] And she was already actively working on Polaris/Beacon business.[183] Devine officially left Caring People on June 15, 2023.[184]

Finally, Gail Feder also left the company around this time. Feder, a branch administrator who worked for Caring People for twelve years, was an extremely valuable asset to the company.[185] Before her departure, Feder had asked the Caring

---

[179] JX 121; Barr Tr. 42:4–9. At trial, Silver Oak principals described the email as disingenuous. But even still, the email was "fairly prescient and pretty accurate in terms of how [Silver Oak would] quantify the impact of [Devine's] departure on the business." Gustafson Tr. 750:16–751:6.

[180] East Tr. 505:11–18; Barr Tr. 43:1–11.

[181] Barr Tr. 42:13–24. *See also* Spero Tr. 206:22–207:11 (explaining the steps taken to get Devine to stay on board); Gustafson Tr. 749:19–750:2 (expressing Caring People's strong desire to retain Devine).

[182] Devine Tr. 935:12–936:3.

[183] JX128.

[184] Devine Tr. 933:20–24.

[185] Feder Tr. 1083:23–1084:2; Spero Tr. 205:3–11 ("[Feder] had really deep relationships in the New York Market. She knew all of our caregivers. So if a new client came on board,

People board for more support in her role—support she never received.[186] The lack of support pushed Feder to consider resignation and retirement. When Spero learned of her resignation, he urged her to remain on board.[187] Spero promised to send Feder an updated compensation package, but she did not receive it for over two weeks.[188] While waiting, Feder found out that Spero went on vacation which contributed to the delay.[189]

When the package did arrive, it was not enough to keep Feder with Caring People. She went forward with her resignation and retirement. The company recognized her retirement by hosting a retirement party, complete with a cake that said "Happy Retirement Gail and Kim."[190] Despite the cake and celebration, Feder pushed back on the idea that she was retiring. She insists that she never told anyone at Caring People that her plan was to retire.[191] When she saw the cake, she explained that she just went along with it because there were at least 75 people at the party.[192]

---

[Feder] would pick up the phone and call our caregivers and make sure that was scheduled. She was very valuable.").

[186] Feder Tr. 1088:5–8, 17–19.

[187] Feder Tr. 1089:11–16 (describing Spero as "very persistent" and "begging [Feder] to stay").

[188] Feder Tr. 1089:17–1090:5.

[189] Feder Tr. 1090:6–13.

[190] Spero Tr. 208:7–23; JX1029. Kim was another employee leaving around that time. *See also* JX1005 (showing a picture of Feder in front of the retirement cake).

[191] Feder Tr. 1091:13–14.

[192] Feder Tr. 1092:8–16.

Retirement or not, Feder's last day at Caring People was June 9, 2023.[193] When she left, she contends did not have a new job lined up.[194] Yet just two weeks later, she was offered a job at Polaris.[195]

### K.    The Fallout

The departure of East, Devine, and Feder, particularly in short succession, caused serious impacts at Caring People. Perhaps the most challenging—yet most foreseeable—impact was in the Long Island market, and particularly in sales post Devine's departure. Because Devine gave six weeks' notice of her resignation, Caring People were able to hire two new salespeople in an effort to pick up the slack. Those two hires, Gina Grossman and Carole Siebner, were hired at the recommendation of East and while Devine was still employed with the company.[196]

But those new hires ultimately did not help the transition. According to Caitlin Aluveaux, the regional director of operations for Caring People, their hiring started off strange and continued to worsen. Siebner, for example, "was not interested in interviewing" and instead relied on the recommendation of East and Devine.[197]

---

[193] Spero Tr. 208:5–6.

[194] Feder Tr. 1091:3–5.

[195] Feder Tr. 1092:22–24. Feder accepted sometime around July 23, 2023. Feder Dep. 66:14–25.

[196] Barr Tr. 142:18–143:6; Aluveaux Tr. 886:8–15.

[197] Aluveaux Tr. 886:22–887:3.

Grossman followed the same process, bypassing the usual interview and onboarding procedures.[198] While the two had experience in another home care agency, neither came to Caring People with any assisted living relationships—relationships from which Caring People sourced most of its business.[199]

The issues with the new hires did not stop there. Siebner did the job remotely while living in South Carolina. That set up, specifically in a sales job that requires face to face interactions, was a difficult one that raised concerns.[200] Additionally, per Aluveaux, Siebner "was not able to follow a process, she was not able to speak to people kindly, with respect. She was not able to work as a team player."[201] Grossman, for her part, focused primarily on hospitals instead of assisted living facilities.[202]

Beyond those two hires, however, Caring People took little to no efforts to bridge the gap in Long Island or generate additional revenue. In March of 2024, then Caring People COO Christine Deleo prepared a report of the Long Island referral sources that Devine serviced, to "see what [Caring People] is getting right now [with] no effort."[203] After seeing the results, she noted that Caring People still got a

---

[198] Aluveaux Tr. 887:5–10.

[199] Aluveaux Tr.887:18–888:5.

[200] Aluveaux Tr. 888:11–17; JX191.

[201] Aluveaux Dep. 225:7–12.

[202] JX191.

[203] JX211 at 2–3. *See also* JX265.

"decent amount" of revenue in Long Island with "absolutely no effort."[204] Spero confirmed that as of March 2024, Caring People devoted little to no effort to generate revenue from Devine's former accounts.[205]

Around that time, there appeared to be a mass exodus occurring in the Caring People sales force.[206] In fact, from the end of 2023 to the end of 2024, the number of Caring People sales representatives and personnel that generated sales revenue declined from 57 to 18.[207] Those departures include Adam Zeidler,[208] Jen Mojave who went to work for a competitor agency,[209] Jessica Adamo who went to work for a competitor agency,[210] Nelida Landin who went to work for a competitor agency,[211] Kim Juers,[212] Amy O'Connor who opened her own business and took a Caring

---

[204] JX211 at 3.

[205] Spero Tr. 295:5–19.

[206] At trial, there were several insinuations that the multiple departures were due to the promotion of Christine Deleo to COO. Deleo was described as "divisive," and some in the company described her promotion as "a very big mistake." Kornblum Tr. 411:22–412:24. Feder herself believed that many of these employees left, shortly after the promotion, due to "very poor management." Feder Tr. 1111:6–15. Deleo's behavior is largely irrelevant to the issues before me.

[207] *Compare* JX2097 *with* JX288.

[208] Spero Dep. 31:13–22.

[209] Devine Dep. 231:2–11; JX2110.

[210] Devine Dep. 242:7–11.

[211] Devine Dep. 242:7–11.

[212] Spero Dep. 81:4–21.

People client with her,[213] Gina Grossman,[214] Carole Siebner,[215] and most recently, COO Christine Deleo, who at the time of trial was employed with a competitor agency.[216]

With such heavy turnover in the sales force, it comes as no surprise that Caring People profits and revenue suffered. Over that same period, new business generation plummeted by more than 24% from roughly $8.6 million in 2023 to $6.5 million in 2024.[217] But the explanations for those loses varied. For example, at least three large referral sources stopped entering staffing contracts, causing a dip in revenue for Caring People.[218] Another major referral source, the Amsterdam, instituted a move-in freeze due to its bankruptcy and sale, giving limited ability to bring on new clients.[219] Briana Henn, the current branch administrator for Caring People, identified five caregivers that left the company to work for COD in an effort to

---

[213] Devine Dep. 232:17–233:9.

[214] Spero Tr. 290:15–23.

[215] Spero Tr. 291:20–24.

[216] JX333.

[217] JX288.

[218] JX2111B; JX2111; Kornblum Tr. 679:24–680:19, 687:17–688:2.

[219] JX2111B; JX2111; Thompson Tr. 1228:22–1229:10.

explain the drop in revenue.[220] But shortly after, she admitted that caregivers can (and often do) work for multiple care agencies.[221]

Caring People's quarterly reports reflected declines in revenue and pointed to one cause: sales force turnover and soft sales performance. From mid-2023 to Q1 of 2025, Caring People's revenue and EBITDA decreased steadily.[222] The company frequently mentioned its struggles retaining sales representatives and tight labor markets. East, Devine, and Feder were never explicitly or implicitly mentioned. From 2023 to 2024, Caring People's EBITDA decreased from $6,629,000 to $5,505,000.[223]

### L.    The "Polaris+Beacon+COD" Team

As Caring People was struggling, East, Devine, and Feder moved quickly to build up Beacon, Polaris, and COD. While still downplaying his involvement, East took several steps to help Polaris and COD get off to a running start. East created COD emails for Devine and Feder.[224] He also gave Devine COD business cards.[225]

---

[220] Henn Tr. 848:1–8.

[221] Henn Tr. 848:11–17.

[222] *See* JX254 at 1–8.

[223] *Id.* at 1.

[224] East Tr. 377:17–24; Feder Tr. 1096:4–16.

[225] East Tr. 378:1–3. East downplayed the significance of this, explaining that both of his children also have COD business cards. East Tr. 378:4–6.

Given Devine's understanding that her role with Polaris would be "supportive" and a "passive" learning opportunity, it begs the question: who would run Polaris?[226] From the evidence presented at trial, it is clear that, at least at the start, East had significant involvement. East not only prepared the paperwork and applications to create Polaris, but he assisted with hiring decisions on at least one occasion.[227] When Polaris employees, including Johnson, had trouble with their emails, they reached out to East to help.[228] East also directed a graphic designer to create and update the Polaris website.[229] And he even authorized payments for Devine's attorneys' fees through Polaris accounts.[230]

Shortly after the group's departure from Caring People, East emailed Devine and Feder on June 19, 2023 with the greeting "Hello Former CP Team new Polaris+Beacon+COD Team."[231] Thereafter, towards the end of June 2023, Devine and Feder launched a marketing and sales campaign in several areas for both COD and Polaris. At one point, they discussed creating a COD "Family Night" marketing event at a New Jersey referral source.[232] Later, East addressed the "team" consisting

---

[226] *See* Devine Tr. 953:7–11.

[227] East Tr. 458:1–12; JX134.

[228] JX124; East Tr. 547:11–548:1.

[229] JX136; JX276.

[230] JX226.

[231] JX141.

[232] JX1008.

of Feder and Devine, and advised that they compile a list of "Nassau/Queens/NYC referral sources . . . to target with [COD's] campaign."[233]

Devine and Feder next turned their attention to the Amsterdam, one of Caring People's biggest revenue sources.[234] In November 2023, they visited the Amsterdam to develop business for Polaris and COD.[235] The Polaris+Beacon+COD team continued to target the Amsterdam as time went on. The team discussed "add[ing] Amsterdam to COD" in February 2024, and East directed Devine to start entering Amsterdam client data into the COD system.[236] The importance of the Amsterdam was even apparent to Johnson, who had little experience in the New York market. Johnson urged the team to "scoop everything in the Amsterdam."[237]

In December 2023, Devine, Fedder, and Flynn discussed marketing strategies at a New Jersey facility: Bentley Commons at Paragon Village.[238] The group discussed a meeting with the facility the following month and possibly providing door hangers or other marketing materials.[239] In the same conversation, Flynn listed

---

[233] JX167.

[234] *See* JX 290–292, 1017. The Amsterdam accounted for over $3.5 million in revenue in 2022 and 2023. Spero Tr. 203:4–20.

[235] JX166; Feder Tr 1142:2–10. When asked if they were pursuing business opportunities for Polaris and COD, Feder admitted, "[w]ell, Polaris and COD do go hand in hand." *Id.*

[236] JX198 at 2.

[237] JX183.

[238] Feder Tr. 1130:18–1131:12.

[239] JX178.

41

several providers who he spoke with and assigned follow up duties to Feder and Devine[240]

The team also took aim at the Residences, another Caring People referral source. According to Caring People employees, they discovered that the facility was providing clients with informational "welcome packets" from COD, which highlighted the partnership between the facility and COD that focused on personal care, medical reminder, and companion care services.[241] In the background, Feder and Devine discussed new clients they had "landed" from the Residences.[242]

Then, in October of 2023, East sent the Polaris+Beacon+COD team a chart that reflected Caring People's "Weekly Admits" by region and referral source.[243] East urged the team to consider the data as part of COD's effort to focus on recipient of care acquisition. He also noted that COD's objectives were well within reach, "especially since [the COD product] is more broadly aligned with the market then an expensive homecare product like [Caring People]."[244]

Polaris and COD did not just focus on referral and revenue sources but also strived to create contractual provider relationships with care providers in the area.

---

[240] *Id.*

[241] JX289; Henn Tr. 826:1–827:12.

[242] JX207; JX208.

[243] JX160.

[244] *Id.*

COD entered into a provider agreement with Polaris sometime in April 2023, similar to the agreement that COD had with Caring People.[245] That September, COD entered another provider agreement with TheKey, another come health care provider.[246] Devine led the discussions that led to this agreement, at East's direction.[247] The partnership with TheKey was crucial, because it was licensed to service patients in New Jersey, while Polaris was not.[248] East expressed his interest in expanding COD and TheKey's partnership to other locations outside New York and New Jersey.[249]

As the team focused on building COD and Polaris, it seemed that they knew their actions were problematic. For example, in June 2023, the COO of COD accidentality emailed Devine at her then dormant Caring People email address. In a profanity-ridden text, Flynn alerted East to his mistake and suggested that they "say it's consulting work if [Caring People] notice."[250] East asked Flynn if he could recall the email, but Flynn was unable to.[251]

---

[245] JX129; JX98.

[246] JX154.

[247] JX1010; JX 1011; Devine Tr. 1053:3–1054:13.

[248] Devine Tr. 1128:7–17.

[249] JX227.

[250] JX140 at 2.

[251] *Id.*

43

Despite all this work, both Devine and Feder deny being employed with COD. Devine supposedly helps COD for free because she believes in its mission.[252] East likewise testified that Devine has never been compensated either directly or indirectly for her work with COD.[253] But, Devine appeared on a podcast with East where she introduced herself as the vice president of business development for COD, indicating "it was an honor to speak on behalf of CaringonDemand."[254] Then, while supposedly not working for COD, Devine prepared a sales plan for the fiscal year of 2024.[255] In that plan, Devine created a graph labeled "Sales Team Structure" where she identified herself as the "VP of Business Development," reporting directly to East.[256] For her part, Feder was identified as COD's "first human point of contact when [COD] onboard[s] new clients."[257]

In whatever capacity they were taken, the team's efforts increased COD and Polaris' profits. Under the COD agreement with Polaris and TheKey, patients would pay COD directly after receiving care.[258] COD retains a share of that payment—

---

[252] East Tr. 378:20–379:4.

[253] East Tr. 378:7–18. *But see* JX281 (COD salary chart reflecting a $200,000 annual salary for Devine and a $85,000 annual salary for Feder).

[254] Devine Tr. 1074:19–1075:1.

[255] JX287.

[256] *Id.* at 4.

[257] JX176.

[258] JX194 at § 3.2; East Tr. 58017–581:17.

typically 20%—and remits the balance to the care provider.[259] Under that scheme, COD paid Polaris approximately $1.1 million for patient care services from April 1, 2024, through April 30, 2025.[260] When accounting for the 20% COD retained, the gross amount paid by patients during that period was around $1.38 million.[261]

For its part, Polaris reported gross revenues of $1.12 million in 2023, $2.1 million in 2024, and $1.03 million from January 1 to June 30 of 2025.[262] Since May of 2025, COD has sent Polaris payments averaging $80,000–90,000 per month.[263] More recently, from May through October of 2025, COD paid Polaris $530,996.43.[264]

As Caring People became more aware of COD and Polaris' success, they took action. At a board meeting on February 12, 2024, Barr moved to remove East as the Rollover Manager of Caring People. That motion passed unanimously.[265] Barr also

---

[259] Pretrial Order ¶ 90; JX194.

[260] Pretrial Order ¶ 91.

[261] *Id.* at ¶ 92.

[262] JX271. Polaris was on track to have an annualized gross revenue of approximately $2.073 million in 2025. Pretrial Order ¶ 95.

[263] Pretrial Order ¶ 93.

[264] Pretrial Order ¶ 94; JX272. Accounting for COD's 20%, that represents a total of $663,745 in additional gross revenue.

[265] JX203 at 2.

moved to approve the filing of this lawsuit. That motion unanimously passed, and this suit was filed the same day.[266]

## II.     PROCEDURAL POSTURE

This action began with the Plaintiff's nine-count verified complaint against East and COD.[267] Attached thereto, the Plaintiffs also filed motions to expedite and for a preliminary injunction.[268] The original judicial officer, Vice Chancellor Cook, heard and denied the motion to expedite on March 12, 2024.[269] The Plaintiffs amended their complaint thereafter, on April 22, 2024, adding Devine as an additional defendant.[270] In response, Devine and East answered, East and COD asserted counterclaims, and COD moved to dismiss.[271] While the motion was pending, Vice Chancellor Cook approved the parties' proposed schedule, leading up to a trial in January 2026.[272]

As for the motion to dismiss, Vice Chancellor Cook scheduled a hearing for January 14, 2025.[273] At the parties' request, however, the hearing was cancelled. On

---

[266] *Id.*; D.I. 1.

[267] D.I. 1.

[268] D.I. 2–3.

[269] D.I. 27.

[270] D.I. 45.

[271] D.I. 55, 58, 69.

[272] D.I. 88.

[273] D.I. 119.

January 7, 2025, the parties reported that they were engaging a mediator, and they requested that the hearing be cancelled to allow them to "focus on reaching a mediated resolution[.]"[274] Vice Chancellor Cook gave them the time requested.[275]

The parties were not, however, able to settle their disputes at mediation and this case, again, heated up. The case was reassigned to me on May 30, 2025.[276] I promptly heard and resolved the pending motions, requiring Devine to fully participate in discovery and dismissing the Plaintiffs' claim against COD.[277] Then, on September 19, 2025, I denied the parties their requested leave to file motions for summary judgment. I saw the requests as pruning exercises aimed at only 4 of 15 counts pending before me, which was "not a good use of anyone's time."[278] Before trial, I denied two final motions (one to compel directed at East and one to exclude the Plaintiff's expert),[279] and clarified procedure and expectations at the January 16, 2026 pretrial conference.[280]

---

[274] D.I. 121.

[275] D.I. 122.

[276] D.I. 147.

[277] *See* D.I. 162, 166. 169.

[278] D.I. 186.

[279] D.I. 212–14.

[280] D.I. 231.

Trial went forward as scheduled from January 20–23, 2026. At trial, East reiterated his motion to exclude the Plaintiffs' expert, which I, again, denied.[281] On February 20, 2026, the parties filed simultaneous post-trial briefs and I took this matter under advisement.[282] Thereafter, on February 24, 2026, the parties filed their stipulation to submit this action to me for a final decision; I approved that on February 25, 2026.[283]

## III. ANALYSIS

The claims pending before the Court are numerous. I address liability first; grouped by defendant/counterclaim defendant and holding the Plaintiffs/counterclaim plaintiffs to their burden of proof by a preponderance of the evidence.[284] I then move to the relief requested.

---

[281] Thompson Tr. 1205:9–13, 1213:20–1214:6. The expert opinion on damages is addressed below.

[282] D.I. 242-44.

[283] D.I. 246-47.

[284] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *St. of R.I. Off. of Gen. Treasurer on Behalf of Empls.' Ret. Sys. Of R.I. v. Paramount Glob.*, 331 A.3d 179, 190 (Del. Ch. 2025) (citing *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)) (internal quotation marks omitted).

Most of the claims pending before me are contract claims through which the proffering party needed to prove: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del.2003).

## A.    The Plaintiffs established East's liability.[285]

The Plaintiffs contend East breached the PCA, Holdco Agreement, and East IUA. I agree and conclude the Plaintiffs met their burden of proof.[286] The Plaintiffs further argue that East tortiously interfered with the Plaintiffs' contractual relations with Devine and Fedder. Again, I agree and find the Plaintiffs met their burden of proof. I depart, however, from the Plaintiffs on their fiduciary duty claim. I address these in turn.

### 1.    The Plaintiffs proved that East breached the PCA.

The Plaintiffs argue that East breached Sections 9.1, 9.2, and 9.3 in the PCA. I address each section in turn.

#### a.    The Plaintiffs proved that East breached Section 9.1.

Section 9.1 of the PCA is a non-competition provision barring East from "directly or indirectly own[ing], hav[ing] an interest in, operat[ing], join[ing], control[ing], or participat[ing] in, or be[ing] connected with as an officer, employee, director, proprietor, member, manager, partner, investor, creditor, adviser, sales

---

[285] East failed to prove unclean hands sufficient to overcome the liability addressed herein. East argues, without support, that there was an untoward plot with deception, perjury, and sandbagging. Such intemperate claims raised without clear evidence are not well taken.

[286] In so holding, I make little of the Plaintiffs' implied covenant claims. The Plaintiffs failed to point to discretionary acts or a cognizable gap sufficient to invoke the implied covenant. *See Osios LLC v. Tiptree, Inc.*, 2024 WL 2947854, at *5 (Del. Ch. June 12, 2024) ("our case law suggests there are two strains of the implied covenant: (1) gap-filling and (2) protecting against arbitrary and bad faith exercise of discretion.").

representative, agent, consultant or otherwise, with any business that is substantially similar to the Business . . . anywhere in the United States of America."[287] Section 9.1 has a carve out that Avior/COD's business as of closing is not within the restricted definition and East's work with Avior/COD would not breach Section 9.1 as long as Avior/COD was not engaged in restrictive business.

With the broad language of Section 9.1 and even accounting for the carve out, East's activities with Polaris and Beacon breached Section 9.1. East's only viable argument to avoid liability therefore is that Section 9.1 is unenforceable and should not be blue penciled.[288] I agree that Section 9.1 has an overbroad geographical scope but hold the equities typically cautioning against blue penciling are not present here and decline, therefore, to relieve East from his agreement.

"Under Delaware law, a covenant not to compete must: (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable."[289] Here, there is no dispute that the Plaintiffs have a legitimate economic interest in seeking enforcement of a non-competition provision

---

[287] JX8.

[288] In so holding, I reject East's arguments that his activities are within the Avior/COD carve out. East's conduct with Polaris and Beacon far exceed the originally contemplated business of Avior/COD and involved direct competition with Caring People.

[289] *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5–6 (Del. Ch. Sept. 28, 2018).

restricting the activities of the founder of the business acquired through the PCA. Thus, I need only address reasonableness and, if reasonable, balancing the equities.

"Ultimately, 'the reasonableness of a covenant's scope is not determined by reference to physical distances' but instead 'the area in which a covenantee has an interest the covenants are designed to protect.'"[290] This Court, thus, looks at whether the scope is broader than necessary to protect the business' interests. Here, it is.

Caring People has grown significantly since its founding in Queens. But it was not nearly a country-wide enterprise, even if judged at the time of trial. The evidence adduced at trial demonstrated that it does business solely within six states—New York, New Jersey, Connecticut, Massachusetts, Texas, and Florida. A country-wide restriction is broader than necessary to protect the business' interests.[291]

I could, however, blue pencil the restriction to narrow the scope and make it sufficiently reasonable. As recently reiterated by the Delaware Supreme Court:

> Delaware courts have the discretionary power to blue pencil overbroad restrictive covenants to align a company's legitimate interests and an individual's right to be free from unreasonable restrictions on their livelihood. On several occasions, the Court of Chancery has utilized

---

[290] *Daxco, LLC v. Timm*, 2026 WL 172862, at *6 (Del. Ch. Jan. 22, 2026) (citations omitted).

[291] *Cf. Cleveland Integrity Servs., LLC v. Byers*, 2025 WL 658369, at *10 (Del. Ch. Feb. 28, 2025) (denying a preliminary injunction to enforce a two-year continent-wide non-compete because it is "facially broader than necessary to protect Plaintiff's U.S. business interests.").

blue penciling to narrow the geographic scope and temporal duration of restrictive covenants to make them reasonable and enforceable. Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business.[292]

At first blush, this case tracks those in which this Court has blue penciled—the parties were both represented by counsel in a transaction indicative of equal bargaining power, the provision was specifically negotiated, and valuable consideration was exchanged in a sale (rather than an employment context). To argue around this congruence, East relies primarily on *Cleveland Integrity*.[293]

In *Cleveland Integrity*, the Vice Chancellor declined to blue pencil overbroad non-competition provisions binding founders who had sold their business. The non-compete at issue purported to bind the founders from competing anywhere in North America, despite their business operating only within the United States. In declining to blue pencil the restriction, she explained:

> While this Court has, in some instances, used its discretion to blue pencil overly broad restrictive covenants, doing so creates confusion, encourages employers to overreach, and encourages litigation "by building a degree of uncertainty into every employment agreement." . . . Plaintiff has no legitimate business interest in countries outside of the

---

[292] *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 486 (Del. 2024) (citations omitted).

[293] 2025 WL 658369 (Del. Ch. Feb. 28, 2025). East also cites to *Weil Holdings*, but I find that employment context provision inapposite. *See Weil Hldgs. II, LLC v. Alexander*, 2025 WL 689191, at *7 (Del. Ch. Mar. 4, 2025).

United States, much less one that could support a two-year noncompete: enforcing an overbroad noncompete carries systemic costs. I decline, in my discretion, to blue-pencil the parties' negotiated agreement.[294]

Most recently, Magistrate Judge Hume re-emphasized the policy against blue penciling, in that it would "eliminate the goal requiring parties to draft restrictions specifically tailored to the parties' circumstances and legitimate business interests. Blue penciling would incentivize future parties to compose restrictions without appropriate accuracy and precision, certain in the belief that the Court would be a safety net for any overreach."[295]

Here, however, I see different incentives at work. As mentioned, the non-compete was expressly negotiated. So much so that the PCA includes the Avior/COD carve out and several confirming clauses, including:

- 9.4 Reasonable Restraint. The Parties agree that the foregoing covenants in this Article 9 impose a reasonable restraint on the Restricted Parties with respect to subject matter, time period and geographical area in light of the activities and business of Buyers and Holdco on the date of the execution of this Agreement.
- 9.5 Severability; Reformation. The covenants in this Article 9 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant. Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the Parties that such restrictions be enforced to the fullest extent which the court deems reasonable, and the Agreement shall thereby be reformed.[296]

---

[294] *Cleveland Integrity Servs., LLC*, 2025 WL 658369, at *12.

[295] *BluSky Restoration Contractors, LLC v. Robbins*, 2026 WL 599148, at *15 (Del. Ch. Mar. 4, 2026).

[296] JX8.

True "the court is unhindered by a provision in [an] uneven agreement that purports to promote blue penciling[, a]nd 'an employee's promise not to challenge the reasonableness of his restrictive covenants cannot circumvent this Court's mandate to review those covenants for reasonableness.'"[297] But, here, the agreement was not uneven and this Court's mandate to review covenants for reasonableness compel it to consider the equities at issue. East was a sophisticated party, represented by counsel, who specifically negotiated the terms of the non-compete through counsel, and received tens of millions of dollars in exchange.

In doing so, East further agreed that the covenants in Article 9 "are a material and substantial part of the transactions contemplated by this Agreement and are supported by adequate consideration."[298] To refuse to blue pencil and relieve him of the consequences of his deal would encourage unfair bargaining practices. Simply put, this case is not one through which the restricted party needs this Court's protection and for which this Court should decline to blue pencil. The equities weigh, instead, in favor of the enforcing party.[299]

---

[297] *Cleveland Integrity Servs., LLC*, 2025 WL 658369, at *9.

[298] JX8 at § 9.7

[299] Caring People's history of and documented plan for future expansion further weighs in favor of blue penciling.

For these reasons, I will blue pencil the non-compete to include only the geographic area in which the Plaintiffs do business. With that limitation, I find the temporal term (5 years from execution or 2 years from separation) reasonable. This modified provision survives a balancing of the equities and was breached by East.

### b. The Plaintiffs proved that East breached Section 9.2.

Section 9.2 of the PCA, for the same period as the non-compete, restricts East from (a) "hir[ing], solicit[ing] for hire, or attempt[ing] to do any of the foregoing" for any "Listed Employee" or officer of Caring People or (b) "divert[ing], entic[ing] away, or in any other manner persuad[ing] or encourage[ing]" any such persons to "terminate their employment with" Silver Oak or Caring People.

Relying on the same general principles addressed above, East argues this language is overbroad and points me to case law striking non-solicits "not limited to prohibiting [the restrictive party] from soliciting employees to join a competitor."[300] This Court has held, and reaffirmed, "that a ban on 'encouraging' employees to leave is unenforceably overbroad because it captures non-competitive conduct."[301]

But the provision here is severable and not nearly so broad.[302] First, in Section 9.2(a)(i) East is barred from "hir[ing], offer[ing] to hire, solicit[ing] for hire or

---

[300] *HKA Glob., LLC v. Beirise*, 2025 WL 3639811, at *5–6 (Del. Ch. Dec. 16, 2025).

[301] *Id.*

[302] *See* JX8 § 9.5.

55

attempt[ing] to do any of the foregoing[.]"[303] That restriction is far narrower than "encouraging" employees to leave; it is direct solicitation within the Plaintiffs' legitimate business interests to restrict. Then in Section 9.2(a)(ii), East is barred from "divert[ing], entic[ing] away, or in any other manner persuad[ing] or encourage[ing] any Non-Solicit Person to terminate such Person's employment . . ., accept employment with a third party, or engage in any of the activities prohibited under Section 9.1[.]"[304] This is the step too far. But the PCA compels me to segregate and separately enforce the enforceable portion of Section 9.2.[305]

Thus, I confirm that Section 9.2(a)(i) is enforceable, under which East is barred from "hir[ing], offer[ing] to hire, solicit[ing] for hire or attempt[ing] to do any of the foregoing[.]" The trial record confirmed that he breached that restriction in his dealings with Devine and Feder. East makes much of his refusal to admit such solicitation. But his testimony lacked credibility; the weight of the documentary evidence showed he played a large role in their departures and new business ventures. East's crafty maneuvers and wordsmithing aside, the Plaintiffs demonstrated that he, more likely than not, solicited Devine and Feder to join the "Polaris+Beacon+COD" Team.

---

[303] *Id.* at § 9.2.

[304] *Id.* Section 9.2(b) addresses non-solicitation of customers, suppliers, and referral sources. The record does not reflect that East violated this portion of Section 9.2.

[305] *Id.* at § 9.5.

### c.    The Plaintiffs proved that East breached Section 9.3.

Section 9.3 of the PCA restricts East's use of confidential information. "Confidential Information" is defined broadly in the PCA to include: "all non-public information regarding the Business[.]" The Plaintiffs specifically challenge East's sharing of three documents: JX43, JX160, and JX1000 (with attachments at JX1001). In JX43, East sent confidential information of a Caring People acquisition target to a COD employee. In JX160, East sent Devine and Feder (at their COD email addresses and after their departure from Caring People) a slide deck from a Caring People report. And in JX1000, East forwarded to a COD employee documents sent by Silver Oak (in JX1001), labeled "CONFIDENTIAL" in the subject line. East argues away these actions with self-serving testimony that nothing was truly "confidential." This argument and testimony is unpersuasive; the documents shared fall within the contractual provision to which he agreed and were transmitted in violation of Section 9.3.

### 2.    The Plaintiffs proved that East breached Section 12.19 of the Holdco Agreement.

The confidentiality provisions in Section 12.19 of the Holdco Agreement are largely coextensive with those addressed in Section 9.3 of the PCA above. For the same reasons discussed, the Plaintiffs met their burden to prove breach.

57

### 3. The Plaintiffs proved that East breached the East IUA.[306]

The Plaintiffs argue that East breached Section 19 in the East IUA. Section 19 is coextensive with the non-solicitation provision in the PCA Section 9.2 addressed above. I hold it is enforceable, and has been breached, to the same extent and for the same reasons as Section 9.2 of the PCA.

### 4. The Plaintiffs proved that East tortiously interfered with the Plaintiffs' contracts with Devine or Feder.

The facts underlying Plaintiffs' tortious interference claim are largely co-extensive with its contractual non-solicitation claims. But to prove a tort, the Plaintiffs needed to prove that East knew of Devine and Feder's contracts and took "an intentional act that is a significant factor in causing the breach of such contract[s], . . . without justification."[307] East knew of Devine and Feder's contractual obligations to the Plaintiffs, yet he solicited both to work with the Polaris+Beacon+COD Team. I hold that solicitation was an intentional act, which was a significant factor in them breaching their underlying contracts.

---

[306] The Plaintiffs earlier argued that East also breached Section 20, but their failure to brief that provision post-trial amounts to waiver. *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003).

[307] *Bhole v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

### 5. The Plaintiffs failed to prove that East owed or breached any fiduciary duties.

To prevail on their breach of breach of fiduciary duty claim, the Plaintiffs needed to prove that East owed and breached a fiduciary duty.[308] The Plaintiffs argue East owed a duty of loyalty requiring "an unselfish loyalty to the corporation" and for him to act in good faith, without any "dishonest purpose or moral obliquity."[309] But, in doing so, the Plaintiffs gloss over Section 6.6 of the Holdco Agreement, which eliminated East's fiduciary duties.[310] The Plaintiffs contend, with little argument, that the exceptions for "fraud, intentional misconduct, [] bad faith violations of the implied [covenant], or . . . breach of any Related Agreement" apply and that the same conduct which supports the contract claims, amounts to fiduciary claims.[311] But, at best, this claim appears to be impermissibly bootstrapped onto the primary contract claim. "Delaware law does not permit a plaintiff to 'bootstrap' a contract claim into a fiduciary duty claim by alleging that the contractual breach was disloyal. [W]here a dispute arises from obligations that are expressly addressed by contract, the contract claim is typically the only one that can proceed."[312] Here, the

---

[308] *In re Dura Medic Hldgs. Inc. Consol. Litig.*, 331 A.3d 796, 819 (Del. Ch. 2025).

[309] *In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 380 (Del. 2023).

[310] JX9 at § 6.6(c).

[311] D.I. 244 ("Pls.' Post-Trial Br.") at 28–29.

[312] *Mckenzie v. Bdo USA, P.C.*, 2026 WL 191010, at *7 (Del. Ch. Jan. 26, 2026) (citations omitted).

fiduciary claim is parallel to the contract claim, lacking any additional or broader scope of facts upon which it would be appropriate to consider an independent fiduciary claim or different potential remedies.[313] I conclude the Plaintiffs failed to articulate any cognizable duty or breach, vitiating this claim.

**B.    The Plaintiffs proved Devine's liability under the Devine IUA, but not the BPA or Holdco Agreement.**

The Plaintiffs contend Devine breached the BPA, IUA, and Holdco Agreement. As explained herein, however, the BPA is unenforceable under New York law and the Plaintiffs failed to prove any breach of the Holdco Agreement (assuming Devine was a party thereto). The Plaintiffs did, however, prove that Devine breached the Devine IUA.[314]

### 1.    The BPA in unenforceable under New York law.

Section 1.3(b) of the BPA provides that Devine "shall not, directly or indirectly, whether individually or as an owner, partner, employee, agent, consultant, advisor, contractor, salesman, officer or director, on Employee's own behalf, or for or on behalf of any other corporation, partnership, venture or other business entity or person, engage in a business substantially similar to or competitive with the

---

[313] *Id.*

[314] Like with East, I make little of the Plaintiffs' implied covenant claims against Devine. The Plaintiffs failed to point to discretionary acts or a cognizable gap sufficient to invoke the implied covenant. *See Osios LLC v. Tiptree, Inc.*, 2024 WL 2947854, at *5.

business of the Company."[315] It further defines "substantially similar to or competitive with the business of the Company" as "any business that provides home healthcare to clients in New Jersey, New York, Florida and/or any other states in which the Company is providing services at the time of Employee's separation from the Company."[316]

Devine's work with Polaris, Beacon, and COD violates this provision. Devine's only "out" is her enforceability argument; Devine argues that the BPA is unenforceable under New York law and the Plaintiffs do not dispute that New York law applies. Specifically, Devine points to *Eastman Kodak Co. v. Carmosin*[317] and *Flatiron Health, Inc. v. Carson*,[318] which I address in return.

In *Eastman*, the court emphasized that under New York law, "[i]t is well established that agreements by an employee not to compete with his or her employer upon the termination of employment are judicially disfavored because powerful considerations of public policy . . . militate against sanctioning the loss of a [person's] livelihood[.]"[319] "Thus, [a] restrictive covenant against a former employee will be enforced only if reasonably limited temporally and geographically . . ., and

---

[315] JX1.

[316] *Id.*

[317] 909 N.Y.S.2d 247 (N.Y. App. Div. 2010).

[318] 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020).

[319] *Eastman Kodak Co. v. Carmosino*, 909 N.Y.S.2d 247, 249 (N.Y. App. Div. 2010).

then only to the extent necessary to protect the employer from unfair competition [that] stems from the employee's use or disclosure of trade secrets or confidential customer lists[.]"[320] This calls for a more stringent review than under Delaware law.

Devine then uses *Flatiron* to call the BPA to task for vague language. In *Flatiron*, the court questioned the use of "similar to" as providing "no criteria to provide notice of which similarities are and are not relevant."[321] The bar for working for businesses "similar to" was thus vague and unenforceable in *Flatiron*.

Beginning with *Flatiron*, the provision here is slightly more specific. It defines the business as more than just "similar to" and it limits the scope to the regions in which Caring People is doing business at Devine's departure. This distinguishes the provision from that found vague in *Flatiron*. But I share Devine's concern that the BPA is broader than necessary to protect Caring People's business. The inclusion of all regions in which Caring People does business and the restriction of even indirect work within the home healthcare industry is broader than New York law would permit under its more stringent lens. The BPA is, therefore, unenforceable and I find no basis under New York law that would allow blue penciling.

---

[320] *Id.*

[321] *Flatiron Health, Inc. v. Carson*, 2020 WL 1320867, at *20 (S.D.N.Y. Mar. 20, 2020).

## 2. The Plaintiffs proved that Devine breached the IUA.[322]

The Plaintiffs also argue that Devine breached Section 19 in the Devine IUA. This section bars Devine, in pertinent part from:

> solicit[ing], divert[ing], entice[ing[]] away, or in any other manner persuad[ing] or encourage[ing] (or attempt[ing] to do any of the foregoing) (i) any actual or prospective customer, supplier or referral source of a CP Company to become a customer, supplier or referral source of any third party that competes with the business of any CP Company or is engaged in the business of providing licensed private duty nursing or home healthcare services and other related services in the United States or (ii) any customer, supplier, referral source, licensee, licensor, consultant or other business relation of a CP Company during the Restriction Period to cease doing or materially reduce its business with a CP Company.[323]

The "Restriction Period" is defined as two years after Devine leaves her employment.

The trial evidence of Devine's actions in connection and on behalf of Polaris, Beacon, and COD supports that she, more likely than not, breached this provision. To avoid liability, Devine argues that the Devine IUA lacked consideration or is unenforceable.

---

[322] The Plaintiffs earlier argued that Devine also breached Section 20, but their failure to brief that provision post-trial amounts to waiver. *Emerald P'rs*, 2003 WL 21003437, at *43.

[323] JX12.

63

The first argument is easily disposed under the reasoning of the Delaware Supreme Court's February 3, 2026 decision in *North American Fire Ultimate Holdings LP v. Doorley*.[324] Therein, the court reinforced that incentive units may be adequate consideration for a restrictive covenant. Devine's continued argument that the incentive units granted to her in the Devine IUA held no value for consideration purposes is a nonstarter.

Devine's second argument is that the restrictions are overbroad and unreasonable. I agree, in part. As addressed above, "[u]ltimately, 'the reasonableness of a covenant's scope is not determined by reference to physical distances' but instead 'the area in which a covenantee has an interest the covenants are designed to protect.'"[325] Here, the non-solicit has two parts. The first is broad: it bars actions toward "any actual or prospective customer, supplier or referral source" to encourage them "to become a customer, supplier or referral source of any third party that competes" with Caring People or who is engaged in "licensed private duty nursing or home healthcare services and other related services in the United States[.]" That scope is far too broad to meet the needs of the employers and the considerations for blue penciling it are much less convincing given Devine's position in the transaction. But the second part is separate and salvable; it bars Devine from encouraging "any

---

[324] 2026 WL 274647 (Del. Feb. 3, 2026) (TABLE).

[325] *Daxco, LLC*, 2026 WL 172862, at *6.

customer, supplier, referral source, licensee, licensor, consultant or other business relation of a CP Company during the Restriction Period to cease doing or materially reduce its business with a CP Company." I find this provision enforceable. And the Plaintiffs proved that Devine violated this narrower provision through, at least, her contacts with the Amsterdam and the Residences.

### 3. The Plaintiffs failed to prove that Devine breached the Holdco Agreement.

The Plaintiffs argue that Devine breached the Holdco Agreement by sharing confidential information. Even if I agree that Devine is bound by the Holdco Agreement (which she strenuously denies), the Plaintiffs failed to prove that Devine shared any confidential information as defined therein. This claim fails.

### C. East and COD largely failed to establish Silver Oak's liability, except as to Section 5.3 of the Holdco Agreement.

East and COD, as counterclaim plaintiffs, contend that Silver Oak (1) breached the Holdco Agreement, or implied convent therein, (2) breached the COD agreement, or (3) is required to indemnify East's attorneys' fees. I address these in turn.

### 1. East proved that Silver Oak breached Section 5.3 the Holdco Agreement.

East contends that Silver Oak breached Section 5.3 of the Holdco Agreement or the implied covenant inherent in Section 5.1. I agree on the former and disagree on the latter. Section 5.3 requires Caring People to distribute to members cash

65

sufficient to cover their tax liability arising from income allocations. There are exceptions, but Silver Oak does not argue any post-trial. Rather, Silver Oak begs me to look at the ERTC situation and forgive its delay as an appropriate board decision. The contract does not provide any such delay mechanism or "out." Silver Oak breached the Holdco Agreement by failing to timely and fully pay to East the April 10, 2022 distribution.

East's implied covenant claim should fail. East disputes Silver Oak's decision not to make discretionary distributions under Section 5.1, arguing that it prioritized itself with management fees over and above making distributions under Section 5.2. East would have me deem this an arbitrary or unreasonable use of discretion; I cannot do so. East failed to meet his burden of proof.

### 2. East failed to prove that Silver Oak breached the 2019 COD Agreement.

East argues that Silver Oak breached the 2019 COD Agreement by refusing to pay the post-termination invoice and failing to pay approximately $1.8 million for OnDemand visits. Neither argument has merit.

Under the 2019 COD Agreement a statement of work was required before COD could properly incur chargeable fees. The 2019 COD Agreement only obligates Caring People to "pay [the invoiced fees] in accordance with the fee and

invoicing schedule set forth in each Statement of Work."[326] Under Section 2.4 of that agreement, "[n]o Statement of Work will be effective unless and until signed by authorized representatives of both parties.[327] The email communications in connection with separation neither modified that requirement nor met the call of a signed and authorized statement of work as contemplated therein.[328] Again, the 2019 COD Agreement provides that a statement of work is "a mutually executed document entered into by the parties pursuant to this Agreement and used to purchase CaringOnDemand Products and Services."[329] No such statement of work was authorized for the post-termination work, vitiating this claim.

For the OnDemand visits, COD failed to provide any documentation to support East's testimony as to the missing payments. COD further failed to point to clients or payments therefrom for which it did not receive its contractual fee. The burden was with COD to do so and it failed.

---

[326] JX18 at § 5.1.

[327] *Id.*

[328] Put another way, JX79 was not an offer that was accepted in JX117; the parties still needed a statement of work.

[329] JX18 at 2.

### 3. East failed to prove that he is entitled to fees from Silver Oak.

East seeks to recover his attorneys' fees from Silver Oak under four theories: (a) indemnification under the Holdco Agreement; (b) fee shifting under Section 12.5 of the Holdco Agreement; (c) prevailing party shifting under the East IUA Section 18; or (d) bad faith fee shifting as an exception to the American Rule.[330] I address each in turn.

#### a. East is not entitled to indemnification under the Holdco Agreement.

Under 6.7 of the Holdco Agreement, a "Covered Person," which includes East, is granted broad indemnification for expenses in actions related to their position in the company "except that no Covered Person shall be entitled to be indemnified in respect of . . . any Indemnified Cost incurred by such Covered Person by reason of . . . such Covered Person's breach of a Related Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party."[331] Having found East liable for breaches of "Related Agreements," I find the exception applies and indemnification is unavailable.

#### b. East is not entitled to fee shifting under the Holdco Agreement.

---

[330] East earlier argued that he was also entitled to indemnification under the PCA but his failure to brief that issue post-trial amounts to waiver. *Emerald P'rs*, 2003 WL 21003437, at *43.

[331] JX9.

The Holdco Agreement further provides in Section 12.5:

> Any party hereto that breaches the terms of this Agreement (the "Breaching Party") further covenants and agrees to indemnify and hold the other parties hereto harmless from and against all costs and expenses, including legal or other professional fees and expenses incurred by such parties, in connection with or arising out of any proceeding instituted by such parties against the Breaching Party; provided that the party or parties seeking indemnification pursuant to this Section 12.5 must have substantially prevailed in such proceeding.[332]

Herein, I have found that Silver Oak breached Section 5.3 of the Holdco Agreement, but I also found that East breached Section 12.19 of the Holdco Agreement. He did not, therefore, "substantially prevail" and is not entitled to contractual fee shifting.

### c. East is not entitled to fee shifting under the IUA.

East points to Section 18 in the East IUA which provides that the prevailing party is entitled to recover all costs, including reasonable attorneys' fees and costs. Having held that East breached the East IUA, the Plaintiffs—rather than East—are the prevailing parties.

### d. There is no basis for bad faith fee shifting.

Finally, East argues for bad faith fee shifting. The standard for bad faith, an exception to the American Rule, is intentionally high and East failed to meet it.[333]

---

[332] *Id.*

[333] *See Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019) ("The Court typically will not find a litigant acted in bad faith for purposes

69

The record before me shows a hotly contested, and heavily litigated action, but no bad faith on either side of the "v."

**D. The Plaintiffs are entitled to damages, injunctive relief, and fees; East is entitled to offsetting damages.**

Having trudged through the parties claims for relief, I now turn to the appropriate remedies for those which prevailed. As a reminder, I have concluded that East breached the PCA (Sections 9.1, 9.2, and 9.3), the Holdco Agreement (Section 12.19), and the East IUA (Section 19), and tortuously interfered with the Plaintiffs' agreements with Devine and Feder. I further concluded that Devine breached the Devine IUA (Section 19). And, finally, that Silver Oak breached the Holdco Agreement (Section 5.3). Now I must address the remedies therefore.

Remedies for breach of contract are typically monetary. The successful party "is entitled to the benefit of his bargain, that is, to be placed, by the payment of damages, in the position he would enjoy had the contract not been breached."[334] Injunctive relief may be warranted when a plaintiff demonstrates (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of equities weighs in favor of issuing the injunction.[335] For tortious interference, remedies in contract and

---

of shifting attorneys' fees unless the litigant's conduct rose to the level of 'glaring egregiousness.'").

[334] *Morabito v. Harris*, 2001 WL 1269334, at *3 (Del. Ch. Oct. 10, 2001).

[335] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sep. 30, 2009).

tort coincide, "as the harm suffered by the tort victim due to the tortfeasor's wrongful act is often the loss of the benefits of its bargain."[336]

The Plaintiffs seek primarily monetary relief; damages to compensate for the breaches established. They also seek injunctive relief to extend the terms of the breached restrictive covenants. I grant both types of relief, in part.

East, for his counterclaim, seeks damages, which I also grant in part, offsetting the amount he owes to the Plaintiffs.

I address the requests in turn.

### 1. The Plaintiffs are entitled to injunctive relief and limited monetary damages.

The easiest request before me is for injunctive relief. The Plaintiffs established that both East and Devine breached certain binding restrictive covenants well before they expired. The terms of those restrictive covenants should be reinstated to provide the Plaintiffs the benefit of their bargain. That means restricting East for the full two years on the PCA and East IUA sections he violated and Devine for two years for the Devine IUA section violated.

---

[336] *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *50 (Del. Ch. Sep. 30, 2013).

The harder question is what, if any, damages the Plaintiffs have proven. To prove their damages case, the Plaintiffs introduced an expert witness, Joseph Thompson of Coherent Economics.[337] Thompson's qualifications as an expert are not in dispute.[338] But the Defendants strongly contest his opinion and the foundation therefor. The Plaintiffs' damages theory, proffered through Thompson, is one of lost profits. Thompson opined that Caring People suffered lost profits totaling approximately $12.4 million.[339] This calculation focused on the New York and New Jersey markets only, with a damages period that ran from July 2023 through March 2027.[340] The start of that period reflects the departure of East and Devine in the first quarter of that year. The end of the damages period reflects, in Thompson's opinion, a "reasonable estimate of when Silver Oak would anticipate a sale of Caring People to a third-party buyer, thereby removing the non-solicit and non-compete restrictions[.]"[341]

---

[337] JX262. Coherent Economics is a "boutique financial consulting firm based in Chicago, Illinois." Thompson Tr. 1156:19–22.

[338] Thompson Tr. 1162:16–21. Thompson holds several degrees from Depaul University and Boston University, as well as accreditations from the American Society of Appraisers and the CFA Institute. JX262; PDX2.

[339] JX262 at 39.

[340] *Id.* at 18.

[341] *Id.*

The report used two methodologies: the yardstick and but-for methods, and measured the "industry growth rate" in the home care industry, while comparing it to Caring People's revenue both pre and post-departure.[342] While Thompson originally examined data in five states, he only included New York and New Jersey in his damages model because the rest did not meet the criteria he employed.[343] New York and New Jersey both had excess attrition of Caring People's referral sources and a significant decline in revenue.[344]

While the math and methodologies used by Thompson are sound, some of the facts and reasoning he relied on to get there stand on more shaky ground. Thomspon admitted that in preparing his report, he assumed full liability and causation.[345] When consulting with Caring People management, they provided no other explanations for potential causes of decline in revenue, other than Devine and East competing.[346] He did, however, explain that the "industry growth rate" calculation he measured takes into account patient morbidity, salesforce turnover, and changes in referral sources.[347] But his opinion does not account for the lack of effort at Caring People

---

[342] *Id.* at 20–23.

[343] Thompson Tr. 1176:7–1178:12.

[344] *See* JX262 at 25–27.

[345] Thompson Tr. 1164:24–1165:4.

[346] Thompson Tr. 1217:9–1218:2.

[347] Johnson Tr. 1172:17–24.

post-Devine's departure nor that Caring People told its shareholders through quarterly reports that their decrease in revenue was due to "turnover with the sales team," "loss of sales representatives," and "wage pressure and overall tight labor market[s]."[348] Rather Thomspon's report attributed all of Caring People's revenue decline in New York and New Jersey solely to the Defendants.[349]

When Thompson was deposed, he conceded that his damages figure of $12.4 million is inappropriate if East and Devine were only found liable for improperly diverting revenue from a handful of clients.[350] But because the $12.4 million damages number assumes that the Defendants caused all of the revenue deviation, Thompson could not comment on how exactly it would be affected.[351]

Given the more nuanced ruling herein, and my concerns about causation for the full lost profits figure, I cannot adopt Thompson's opinion. It would result in an unsupported windfall to the Plaintiffs and falls far short of the reasonable estimate required.[352] Perhaps expecting this result, in post-trial briefing, the Plaintiffs argued, in the alternative, for a segmented award by geographic region or time frame.

---

[348] JX254.

[349] Thomspon also failed to address the Amsterdam's bankruptcy, competition from other Caring People employees who left to work for competitors during this time, or the cancellation of staffing contracts.

[350] Thompson Tr. 1218:7–1220:12.

[351] Thompson Tr. 1220:10–16.

[352] *See Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *16.

I find this proposal much more palatable. The Plaintiffs have established that the Defendants competed and solicited primarily within New York and that Caring People's profits declined significantly in response.[353] Because that decline cannot be solely contributed to the Defendants, I will only award the Plaintiffs half of their New York lost profits.[354] I will also limit the recovery from Q3 2023 through Q2 2025, after which time the Plaintiffs should have had mitigation efforts well under way. The Plaintiffs are therefore entitled to $4.304 million.

Unless the Defendants agree otherwise, I decline to assess such damages against the Defendants jointly and severable. Rather, I find they should be allocated unequally to account for East's oversized role in the competitive conduct and Devine's limited liability under the sole provision that binds her (the narrowed non-

---

[353] The Defendants argue that the Plaintiffs failed to prove causation because they could not specify any diverted clients or referral sources, and the revenue lost thereby. Although I have discounted recovery for such deficiency, I do not agree that causation is lacking. The Plaintiffs' demonstrated breaches, resulting declines, and I have discounted those appropriately to reduce external factors. *See Red Sail Easter Ltd. Partners, L. P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) ("The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack [mathematical] certainty are permissible so long as the court has a basis to make a responsible estimate of damages.").

[354] In doing so, I exclude New Jersey, for which the Plaintiffs' causation showing was weaker. The ½ reduction of the New York amount accounts for the non-negligible level of other disruption to the business and mitigates against the inevitable loss with two rainmakers; even absent competition, the departures of East and Devine would likely lead to a loss in Caring People's revenue. But, with the proven competition and solicitation, it is a reasonable assumption that significant loss was from the breaching conduct and not mere attrition, and I value it, based on the evidence before me at ½.

solicit under the Devine IUA). I hold that a split of 3/4 ($3.228) for East and 1/4 ($1.076) for Devine is appropriate.

This damages award accounts for the lost profits suffered by the Plaintiffs for the Defendant's breaches of their binding restrictive covenants (East's non-compete and non-solicit in the PCA and East IUA and Devine's breach of the Devine IUA). The Plaintiffs have not demonstrated any additional damages flowing from East's breach of the Holdco Agreement or tortious interference. I further reject the Plaintiffs' arguments for disgorgement (premised on its unsuccessful fiduciary claim) and an EBITDA multiple (as unsupported and duplicative of its lost profits recovery).

As noted above, the Plaintiffs are, however, entitled to recovery as prevailing parties under the East IUA and the Devine IUA. I decline, however, to shift fees in full, because the IUAs were only a portion of this much larger case. I conclude that 1/3 is an appropriate allocation of the Plaintiffs' reasonable fees and expenses to shift

to the Defendants, jointly and severally.[355] If the parties cannot agree on an amount, the Plaintiffs shall submit an affidavit under Court of Chancery Rule 88.[356]

The Plaintiffs are also entitled to prejudgment and post-judgment interest. "In Delaware, prejudgment interest is awarded as a matter of right. Such interest is to be computed from the date payment is due."[357] "Where damages do not accrue immediately upon breach, prejudgment interest is measured from the date on which the damages began to accrue."[358] I see no reason to depart from that routine practice, and I grant the Plaintiffs' prejudgment interest on their damages at the legal rate.[359]

Post-judgment interest is also awarded as a matter of right.[360] "Prejudgment interest is part of the 'judgment' and, as such, should be included in the amount on

---

[355] *See Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007) ("Delaware law dictates that, in fee shifting cases, a judge determines whether the fees requested are reasonable."); *Black v. Staffieri*, 2014 WL 814122, at *4 (Del. Feb. 27, 2014) (TABLE) (This court has "broad discretion in determining the amount of fees and expenses to award."). Another factor guiding my decision is Devine's status as an employee. *See Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *15 (Del. Ch. 1992) ("The Special context of an employment contract may be thought to raise special concerns [in enforcing fee shifting agreements]. Employees as a class may be thought to lack bargaining power *vis a vis* their employers and thus the enforcement of a provision shifting legal fees in an employment contract may, at least in some cases, offend the policy of the law that has sought to permit necessitous persons to avoid oppressive bargains that were forced upon them.").

[356] With this mixed bag ruling, I decline to shift costs to any side as the prevailing party under Court of Chancery Rule 54(d).

[357] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

[358] *Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *37 (Del. Ch. May 30, 2024).

[359] *See* 6 *Del. C.* § 2301(a).

[360] *See Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 978 (Del. 2021).

which post-judgment interest accrues."[361] The Plaintiffs are awarded post-judgment interest at the legal rate on the combined amount of the damages award and the pre-judgment interest. Post-judgment interest, like prejudgment interest, will compound quarterly.

### 2. East is entitled to compensatory monetary damages.

East is entitled to damages for Silver Oak's breach of Section 5.3 of the Holdco Agreement. He seeks the principal amount unpaid, late payment penalties, and interest on his federal taxes. The latter two are not appropriately attributed to Silver Oak's breach as consequential damages. I will, however, award the total principal balance due: $355,533.00. And for the same reasons discussed above, I award East prejudgment and post-judgment interest, both of which compound quarterly. This amount should offset the amount East owes the Plaintiffs, above.

## IV. CONCLUSION

For these reasons, I find that East breached the PCA (Sections 9.1, 9.2, and 9.3), the Holdco Agreement (Section 12.19), and the East IUA (Section 19), and tortiously interfered with the Plaintiffs' agreements with Devine and Feder. I further concluded that Devine breached the Devine IUA (Section 19). And, finally, that Silver Oak breached the Holdco Agreement (Section 5.3). The two-year terms of the

---

[361] *NGL Energy P'rs LP v. LCT Cap., LLC*, 319 A.3d 335, 338 (Del. 2024).

78

Defendant's restrictive covenants are reinstated. The Plaintiffs are entitled to $4.304 million in damages, allocated ¾ to East and ¼ to Devine, plus pre- and post-judgment interest but minus East's entitlement to $355,533.00, plus pre- and post-judgment interest.